LINDA RAYBECK *v.* DANBURY ORTHOPEDIC
ASSOCIATES, P.C., ET AL.
(AC 20737)

Dranginis, Flynn and Daly, Js.[1]

---

[1] This appeal was argued before a panel comprised of Judges Dranginis, Flynn and Daly. Although Judge Daly agreed with the other two judges regarding the resolution of this appeal, he died before he had the opportunity to concur with the written decision. The parties stipulated, however, that they would not reargue the appeal to this court with a panel consisting of the original two judges and an additional judge. Rather, the parties stipulated that they would permit the remaining two judges alone to render a written decision.

Argued January 8—officially released September 17, 2002

*Edward F. Hennessey*, for the appellant (plaintiff).

*Augustus R. Southworth III*, with whom, on the brief, was *Isabella S. Murray*, for the appellee (named defendant).

### Opinion

FLYNN, J. In this medical malpractice action, the plaintiff, Linda Raybeck, appeals from the judgment of the trial court, rendered after a jury trial, in favor of the named defendant, Danbury Orthopedic Associates, P.C.[2] On appeal, the plaintiff claims that she is entitled to a new trial because the court (1) improperly overruled her objection to a portion of the defendant's closing argument and refused to give a curative instruction to the jury regarding that portion of the argument, (2) improperly instructed the jury that the plaintiff was required to prove through expert testimony that the defendant had a duty to inform the plaintiff of the risks and benefits of the surgical procedure that was performed on her injured wrist and any alternatives to that procedure, (3) improperly admitted certain evidence

---

[2] This action was originally instituted against the defendant Danbury Orthopedic Associates, P.C, and its agents, Dr. Thomas M. Malloy and Dr. Roger J. LaGratta. Shortly before trial, the matter was withdrawn as against Dr. Malloy and Dr. LaGratta. We therefore refer in this opinion to Danbury Orthopedic Associates, P.C, as the defendant.

and excluded other evidence, (4) improperly instructed the jury with respect to medical negligence and informed consent in that the instruction was inadequate and misleading, (5) unduly limited the jury charge to only a portion of the plaintiff's claims of failure to treat and failure to inform and (6) improperly directed and refused to set aside a verdict in favor of the defendant on portions of the plaintiff's claims of failure to treat and failure to inform. We agree with and find dispositive the plaintiff's first and second claims and grant the relief requested. We discuss the plaintiff's remaining claims only insofar as those claims are likely to arise on retrial.

The following facts and procedural history are relevant to our resolution of the plaintiff's appeal. The plaintiff is employed as a title searcher, who, in the performance of her duties, is required to lift heavy books of land records. On February 8, 1994, she fell on an icy sidewalk and injured her left wrist. She sought treatment for that injury at the Danbury Hospital emergency room that same day. While at the emergency room, the plaintiff was treated by Dr. Thomas M. Malloy, an orthopedic surgeon who was associated with the defendant corporation. Dr. Malloy informed the plaintiff that she had sustained a Colles' fracture of the left wrist. He further informed her that the appropriate treatment for her injury was a closed reduction and casting and that the only other alternative was to not treat the wrist at all. Thereafter, the plaintiff consented to, and Dr. Malloy performed, a closed reduction and casting, which involves manually realigning the bones and applying a cast while the patient is under general anesthesia.

The plaintiff went to the defendant's facility for a series of follow up visits during the months of February, March and April, 1994. During those visits, the plaintiff was seen and treated by both Dr. Malloy and Dr. Roger

LaGratta, another physician associated with the defendant corporation. Both physicians noted that although the fracture was healing, the plaintiff's wrist had begun to develop a tilt as it healed. That tilt became more pronounced over time with one of the bones in her wrist protruding outward, which made the wrist appear deformed. The plaintiff also complained of extreme pain throughout the course of her treatment, for which Dr. Malloy and Dr. LaGratta prescribed physical therapy. After the plaintiff's April 14, 1994 visit at the defendant's facility, she sought a second opinion regarding the healing of her wrist from her family physician, Dr. Oscar Lascano. Dr. Lascano recommended that the plaintiff see a specialist. Sometime thereafter, on Dr. Lascano's recommendation, the plaintiff, who was still experiencing a great deal of pain in her wrist, sought an orthopedic evaluation at Yale University School of Medicine with Dr. Scott Wolfe, a surgeon. Dr. Wolfe performed surgery on the plaintiff's wrist both to repair the deformity in her wrist, evidenced by the tilt that had developed, and to avoid further degeneration. Subsequently, the plaintiff instituted this action in a one count complaint alleging (1) lack of informed consent and (2) medical malpractice.[3]

Portions of the deposition testimony of the plaintiff's expert witness, Dr. Elias Sedlin, a physician, were

[3] Specifically, the plaintiff alleged that the defendant "failed to conform to proper medical standards in one or more of the following ways: a. it failed to properly advise and inform [the plaintiff] of the treatment options available to her; b. it failed to advise [the plaintiff] of the risks associated with a closed reduction of a fracture of the type and severity that her fracture presented; c. it utilized casting rather than open or pinning procedures, at times when the latter was the proper procedure under the circumstances; d. it failed to treat the wrist once it knew or should have known that the closed reduction performed on February 8, 1994 had been unsuccessful; e. it failed to inform [the plaintiff] of the failure of the closed reduction when it was first detected; f. it failed to advise, inform, recommend or treat [the plaintiff] for the malunion that was further observed in late March and April, such period more specifically being March 16 through April 14, 1994."

admitted into evidence at trial. Through his deposition, Dr. Sedlin testified both as to informed consent and the standard of care required of an orthopedist treating a fracture similar to the one sustained by the plaintiff. He testified that the plaintiff should have been informed that casting carried some risk in that in some cases, the bones may slip out of alignment and, as a result, the fracture would heal improperly. He also testified that there were alternative treatments that the defendant could have employed and that the plaintiff should have been informed of those alternatives. He opined that one such alternative was to employ percutaneous pins to hold the fractured wrist bones in place. In fact, Dr. Sedlin testified that the standard of care for the type of fracture sustained by the plaintiff required that the wrist be pinned, rather than cast as had been done by the defendant, and that the defendant's failure to employ pinning rather than casting constituted a deviation from the standard of care. The defendant's medical expert, Dr. Derek Woodbury, testified at trial that the standard of care mandated casting rather than pinning and that he, like Dr. Malloy, believed that the only alternative to casting was to simply let the fracture heal on its own.

After the conclusion of the evidence from both parties, the court instructed the jury regarding informed consent and medical malpractice. Thereafter, the jury returned a general verdict in favor of the defendant. The plaintiff filed a motion to set aside the verdict and for a new trial. The court denied the plaintiff's motion and rendered judgment in favor of the defendant. This appeal followed. Additional facts will be set forth as necessary.

I

The plaintiff first claims that the court improperly overruled her objection to a portion of the defendant's

closing argument and refused to give a curative instruction to the jury regarding that portion of the argument. Specifically, she argues that a portion of defense counsel's argument was improper because it invited the jury to draw an adverse inference from the fact that the plaintiff had failed to produce Dr. Sedlin's partner, Dr. Michael Houseman, as a witness at trial. She further argues that although the missing witness rule set forth in *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 674–75, 165 A.2d 598 (1960), has been abrogated in civil cases by General Statutes § 52-216c, the applicability of § 52-216c is limited to closing arguments in situations where counsel first has given a prior fairness notice. She contends that because no notice was provided here, the argument was improper and the court should have given a curative instruction. The defendant counters with the argument that § 52-216c is inapplicable because counsel did not explicitly argue to the jury that it should draw an adverse inference from the fact that the plaintiff failed to produce Dr. Houseman as a witness and, therefore, there was no need for the court to give a curative instruction. The defendant further argues that even if § 52-216c is applicable, the language of the statute does not mandate that prior notice be given before counsel invites the jury to draw an adverse inference from a party's failure to produce a witness at trial. We agree with the plaintiff.

As a preliminary matter, we set forth the applicable standard of review. "The trial court is invested with a large discretion with regard to the arguments of counsel and while its action is subject to review and control, we can interfere only in those cases where the discretion was clearly exceeded or abused to the manifest injury of some party." (Internal quotation marks omitted.) *Marchell* v. *Whelchel,* 66 Conn. App. 574, 586, 785 A.2d 253 (2001). Nonetheless, where we must interpret a statute regulating final arguments, our review of the

meaning of that particular statute is plenary. *Statewide Grievance Committee* v. *Connor*, 260 Conn. 435, 439, 797 A.2d 1081 (2002).

We begin our resolution of the plaintiff's first claim with a brief overview of the *Secondino* rule. "In *Secondino* v. *New Haven Gas Co.*, [supra, 147 Conn. 674–75], our Supreme Court held that the failure to produce a witness for trial who is available and whom a party would naturally be expected to call, warrants an adverse inference against that party. This is commonly referred to as the *Secondino* rule or missing witness rule. The jury charge explaining the rule is known as the *Secondino* instruction or missing witness instruction." *State* v. *Bailey*, 56 Conn. App. 760, 761 n.1, 746 A.2d 194 (2000). The reasoning behind the missing witness rule was that "[t]he failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause. . . . To take advantage of [the] rule permitting an adverse inference, [however] the party claiming the benefit [of the rule was required to] show that he [was] entitled to it." (Citation omitted; internal quotation marks omitted.) *Close, Jensen & Miller, P.C.* v. *Lomangino*, 51 Conn. App. 576, 584, 722 A.2d 1225, cert. denied, 248 Conn. 905, 731 A.2d 306 (1999). "A party [was required to] seek and obtain an advance ruling from the trial court before arguing to the jury that an unfavorable inference should be drawn from the absence of a witness at trial. . . . Unless [a] party [fulfilled] the requirements of a *Secondino* charge . . . he [was] not . . . allowed to argue it to the jury in any form, full or watered down." (Citation omitted; internal quotation marks omitted.) *Krupien* v. *Rai*, 56 Conn. App. 247, 249, 742 A.2d 1270 (1999), cert. denied, 252 Conn. 931, 746 A.2d 793 (2000).

In 1998, the General Assembly enacted General Statutes § 52-216c, which abrogated the *Secondino* rule by prohibiting the trial court from giving a *Secondino* charge in civil cases. Section 52-216c provides in relevant part: "No court in the trial of a civil action may instruct the jury that an inference unfavorable to any party's cause may be drawn from the failure of any party to call a witness at such trial. However, counsel for any party to the action shall be entitled to argue to the trier of fact during closing arguments . . . that the jury should draw an adverse inference from another party's failure to call a witness *who has been proven to be available to testify.*" (Emphasis added.)

Under our reading of the "proven to be available" language of the statute, the advance ruling requirement set forth in *Secondino* has been preserved in § 52-216c. Accordingly, the court is prohibited from instructing the jury on the issue, but counsel is not prohibited from arguing that the jury should draw an adverse inference from any party's failure to call a witness at trial, provided that counsel first has proven to the court that the witness was one who was available to testify.

A review of the legislative history of § 52-216c also reveals that the legislature contemplated that before counsel would be allowed to invite the jury to draw an adverse inference from another party's failure to call a particular witness at trial, the trial judge must make a finding that the witness at issue was actually available. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 1998 Sess., p. 1564. The legislature intended that the trial judge make this finding on the basis of the evidence offered during trial.[4] Id. The requirement

---

[4] "[T]he way it is usually done is either you serve a subpoena on that witness and put the subpoena in evidence to show that that person was available or, for instance, in a [case], husband—wife, the wife is the passenger. The husband is the plaintiff. The question is who had the red light. The husband doesn't call the wife as a witness. Then the husband's on the witness stand and you say, by the way, where's your wife? Well, she's home. Established availability." Conn. Joint Standing, Committee Hearings,

that counsel first make an evidentiary showing that the witness is available before arguing that the jury should draw an adverse inference from the witness' absence at trial demonstrates that the legislature recognized the inherent unfairness and impropriety of allowing counsel to invite the jury to draw an adverse inference from one party's failure to produce a particular witness at trial if that witness had died or for some other reason was unavailable to testify at trial. Id.

The following additional facts are relevant to our resolution of this claim. In the course of Dr. Sedlin's deposition testimony, he indicated that, while on a skiing trip, his wife sustained a fracture similar to that sustained by the plaintiff. Dr. Sedlin explained that he employed a cast to treat his wife's fracture because the two of them were planning to go to Tahiti and his wife did not consent to be treated with pins because she knew that if pins were employed, she would be unable to boat or swim. Counsel for the defendant then asked Dr. Sedlin what treatment plan would have been accorded to his wife if not for the Tahiti trip. Dr. Sedlin indicated that he would have referred his wife to his partner, Dr. Houseman, for percutaneous pins.

During closing argument, in referring to Dr. Sedlin's testimony, the defendant's counsel argued as follows: "If he had a patient [that] he thought needed percutaneous pinning, he would refer that patient to his partner, who is an expert. *Maybe if he had been here, Dr. Houseman, we would have found out how those patients really would have been treated.*" (Emphasis added.) The defendant's counsel offered no evidence that Dr. Houseman was available to testify at trial. Out of the presence of the jury, the plaintiff's counsel requested the court to give a curative instruction on the missing

Judiciary, Pt. 5, 1998 Sess., p. 1564, remarks of Robert Adelman on behalf of the Connecticut Trial Lawyers Association.

witness rule. The court denied his request after finding that counsel did not ask the jury to draw an adverse inference from Dr. Houseman's absence at trial.

We conclude that the plaintiff was entitled to a curative instruction on the defendant's argument that the plaintiff did not call Dr. Houseman as a witness at trial. There is no doubt that in arguing "maybe if [Dr. Houseman] had been here . . . we would have found out how [the plaintiff] would have been treated," the defendant's counsel was implicitly, if not explicitly, asking the jury to infer that the plaintiff should have produced Dr. Houseman's expert testimony, rather than Dr. Sedlin's, and that if Dr. Houseman had been produced, he likely would have given testimony that was contrary to Dr. Sedlin's testimony and adverse to the plaintiff's case.

We also conclude, despite the defendant's argument to the contrary, that the language of § 52-216c does require that advance notice be given before counsel is allowed to argue that the jury should draw an adverse inference from the opposing party's failure to produce a witness at trial. It is obvious from both the "proven to be available to testify" language of § 52-216c and the legislative history that the legislature intended not only that there be *advance notice* of counsel's intent to invite the jury to draw an adverse inference from a party's failure to call a witness, but that there be an *advance ruling* by the trial judge that counsel has provided some evidentiary basis entitling him or her to do so. This conclusion comports with the general principle that in closing argument before the jury, "counsel may comment upon facts properly in evidence and upon reasonable inferences drawn therefrom." (Internal quotation marks omitted.) *Skrzypiec* v. *Noonan*, 228 Conn. 1, 16, 633 A.2d 716 (1993). "Counsel may not, however, comment on or suggest [in closing argument] an inference from facts not in evidence." (Internal quotation marks omitted.) *State* v. *Graham*, 67 Conn. App. 45, 49–50,

787 A.2d 11 (2001), cert. denied, 259 Conn. 911, 789 A.2d 996 (2002). Without first providing an evidentiary basis that Dr. Houseman was available to testify at trial, it was improper for counsel to comment on the plaintiff's failure to present Dr. Houseman as a witness because such a comment invited the jury to draw an inference from facts not in evidence.

The defendant opines that under *State* v. *Malave*, 250 Conn. 722, 740–41, 737 A.2d 442 (1999) (en banc), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000), no curative instruction was necessary because the defendant's counsel did not *expressly* argue that the plaintiff failed to produce a witness. We disagree. The holding in *Malave*, which abrogated the *Secondino* rule in criminal cases, is applicable only in criminal cases. Section 52-216c is applicable in civil cases. The defendant does not point to any statutory language that can fairly be interpreted to mean that § 52-216c is applicable only where counsel *expressly* exhorts the jury to draw an adverse inference from a party's failure to present a particular witness. Furthermore, such an interpretation of the statute would allow counsel to circumvent the evidentiary predicate and prior ruling requirements of § 52-216c by simply arguing implicitly, rather than explicitly, that the jury should draw an adverse inference from a witness' absence and would eviscerate the "proven to be available to testify" language of § 52-216c, the purpose of which was to prevent an adverse inference from being drawn where it was unfair to do so. It is improper to interpret a statute in a manner that thwarts its purpose; *Water Pollution Control Authority* v. *Keeney*, 234 Conn. 488, 498, 662 A.2d 124 (1995); or creates a bizarre result. *Bovat* v. *Waterbury*, 258 Conn. 574, 587, 783 A.2d 1001 (2001). We refuse to interpret § 52-216c in such a manner here.

In the present case, the defendant's counsel neither sought nor obtained an advance ruling from the court before arguing to the jury that it should draw an adverse inference from the fact that the plaintiff did not produce Dr. Houseman as a witness, and the record is devoid of any evidence that showed that Dr. Houseman was available to testify at trial. We conclude, therefore, that defense counsel's remarks in closing were improper and that the court clearly abused its discretion in failing to give a curative instruction on that portion of his argument.

We also conclude that this impropriety was harmful. Although the court ruled on a request for a curative instruction as to final argument, that ruling implicates an evidentiary consideration about whether the jury was being asked to draw an improper inference without an adequate factual basis in the evidence. "[B]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . When determining that issue in a civil case, the standard to be used is whether the erroneous ruling would likely affect the result." (Internal quotation marks omitted.) *Dubreuil* v. *Witt*, 65 Conn. App. 35, 45, 781 A.2d 503 (2001). In the present case, liability was not conceded, and Dr. Sedlin and Dr. Woodbury, the plaintiff's and the defendant's expert, respectively, gave conflicting testimony on both the duty of care and informed consent. In what was a battle of experts, we conclude that the jury, in returning a verdict for the defendant, likely may have drawn an adverse inference from the plaintiff's failure to call Dr. Houseman to testify due to the improper remarks made by the defendant's counsel.

II

The plaintiff next contends that the court improperly instructed the jury that she was required to prove

through expert testimony that the defendant had a duty to inform the plaintiff of the risks and benefits of casting and of any alternatives to that procedure.

We begin our analysis of the plaintiff's claim with the well established standard of review. "When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.,* 254 Conn. 131, 142–43, 757 A.2d 516 (2000).

The plaintiff argues that her claim that expert testimony was not required to establish that the defendant had a duty to inform is controlled by our Supreme Court's decision in *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.,* supra, 254 Conn. 131, which was decided subsequent to the plaintiff's trial and which involved the same trial judge, the same plaintiff's counsel and the same defense counsel.[5] We agree.

---

[5] The defendant claims that this case is controlled not by *Godwin,* but rather by *Mason* v. *Walsh,* 26 Conn. App. 225, 230, 600 A.2d 326 (1991), cert. denied, 221 Conn. 909, 602 A.2d 9 (1992), because the plaintiff was treated by two physicians, Dr. Malloy and Dr. LaGratta. We disagree. In *Mason,* where the plaintiff was treated by three physicians, a urologist and two anesthesiologists, the issue before this court was which of the three, if any, owed the plaintiff the duty of disclosing facts sufficient to permit him to make an informed consent to the use of general anesthesia. This court held that, under such circumstances, it was incumbent upon the plaintiff to establish by expert testimony which of the physicians, if any, owed him the duty of disclosing information sufficient for him to exercise an informed consent. In the present case, the plaintiff did not claim that *either* Dr. Malloy

In *Godwin,* our Supreme Court held that "[i]n a case where only one physician treats the patient, it is not necessary to establish through expert testimony that the physician had a duty to inform the patient prior to a surgical procedure." Id., 145. In the present case, the court instructed the jury as follows: "The plaintiff . . . has alleged that the defendant . . . failed to properly advise and inform her of treatment options available to her, and failed to advise her of the risks associated with a closed reduction of a fracture of the type and severity of a Colles' fracture she sustained. It is the duty of every physician or surgeon, if the duty is proven to exist, to give the patient all of the information that is material to the decision the patient will make in undergoing a proposed operation or procedure. . . . *The plaintiff must first establish a duty to inform. This must be shown by expert testimony, and in this case that was shown because both Dr. Malloy and Dr. LaGratta testified concerning information provided to [the] patient and an explanation of alternatives to the proposed procedures and that [a] duty to inform a patient exists. There was disagreement as to what the information should consist of, but there was an agreement that there was a duty to inform.* Therefore, if you find that the plaintiff . . . has proven a duty to inform, you will then go on to determine the degree or the extent of the disclosure in accordance with the following standards. Now, the standard is what has been referred [to] as a lay standard . . . ." (Emphasis added.)

We conclude in this case, as did our Supreme Court in *Godwin,* that "the trial court properly instructed [the]

---

or Dr. LaGratta owed her a duty of obtaining informed consent but that *both* owed her that duty on separate and distinct treatment occasions. Furthermore, because the court charged out of the jury's consideration the plaintiff's allegations of lack of informed consent occurring after February, 1994, and because Dr. LaGratta did not treat the plaintiff until sometime in March, 1994, her claim of lack of informed consent involved only one physician.

jurors that the defendant was required to follow a lay standard in providing informed consent to the plaintiff. Nevertheless, it improperly instructed the jury that the plaintiff was required to establish through expert testimony that the defendant had a duty to inform." Id., 143–44.

Our analysis does not end, however, with our conclusion that the court's charge was improper; "[w]e must next determine whether the improper instruction was harmful because it would have been likely to affect the jury's verdict." *Richmond* v. *Ebinger*, 65 Conn. App. 776, 782–83, 787 A.2d 552 (2001), citing *Remington* v. *Aetna Casualty & Surety Co.*, 240 Conn. 309, 316, 692 A.2d 399 (1997). We conclude that the improper instruction here was harmful. Unlike the trial court in *Godwin*, the trial court in the present case instructed the jury that there was expert testimony, from both Dr. Malloy and Dr. LaGratta, that there was a duty to inform the plaintiff of the risks and benefits of the procedure and alternatives to that procedure. The court further instructed the jury that it was the plaintiff's duty to establish the duty to inform and that only *if* the jury found that she had met her burden, should it then go on to determine the extent of the disclosure. Finally, the court instructed the jury that the credibility of the witnesses was a matter entirely within the province of the jury. Under that instruction, if the jury chose to discredit the testimony of Dr. Malloy and Dr. LaGratta with regard to the duty to inform, it could not reasonably or legally have reached any conclusion other than that the plaintiff did not meet her burden of proving an element of her case and would necessarily have returned a verdict in favor of the defendant. Yet, under *Godwin*, the jury was not limited to expert testimony in finding that the defendant had a duty to inform; it could have relied on its own lay assessment, which the charge foreclosed the jury from doing. Accordingly,

we conclude that the challenged instruction here was harmful because it was likely to have affected the jury's verdict.

### III

The plaintiff next claims that the court improperly admitted certain evidence and excluded other evidence. We address these claims only insofar as they are likely to arise on retrial.

### A

The plaintiff first argues that the court improperly excluded a statement made to her by an emergency room physician while she was waiting to be treated.[6] We agree.

The following additional facts are necessary to our discussion of this issue. During her deposition, the plaintiff testified that one of the physicians in the emergency room, as well as the attending nurses, told her that her wrist was "a real mess" and that she should expect to stay awhile to have her wrist pinned. The defendant filed a motion in limine seeking to bar the plaintiff from offering that evidence, arguing that it constituted hearsay because it was an out-of-court statement offered to prove the truth of the matter asserted, namely, that the duty of care required that the plaintiff's wrist be pinned, and that the statement did not fall within an exception to the hearsay rule. The plaintiff objected to the defendant's motion, arguing that the statement was not offered to show that her wrist should have been pinned but was offered, instead, to show that she would have consented to a pinning procedure

---

[6] The plaintiff also argues that this testimony should have been allowed once the defendant opened the door to its admissibility by challenging the plaintiff's recollection of what she was and was not told while at the emergency room. In light of our determination that the statement should have been admitted initially, we conclude that it is unnecessary to address this argument.

had that alternative been offered to her. After a lengthy argument by counsel, the court ruled that the out-of-court statement was hearsay and was, therefore, inadmissible. Thereafter, in its jury charge, the court instructed the jury that the plaintiff had the burden of proving that if percutaneous pins had been presented to her as an alternative, she would have consented to their use.

The plaintiff claims that this out-of-court statement should not have been excluded as hearsay because it was not offered for its substantive truth. "In Connecticut, an out-of-court statement offered to prove the truth of the matter asserted is hearsay. . . . If such a statement is offered for a purpose other than establishing the truth of the matters contained in the statement, it is not hearsay." (Citation omitted.) *State* v. *Esposito*, 223 Conn. 299, 315, 613 A.2d 242 (1992).

In this case, the plaintiff offered the statement of the emergency room physician to show its effect on her, namely, that if she had been offered the choice of percutaneous pins, she would have consented to such a procedure. The statement was not offered to show that the duty of care required that percutaneous pins be employed to treat the plaintiff's fracture. Accordingly, if, on retrial, the plaintiff offers out-of court statements of the physician at the emergency room and the attending nurses to prove their effect on her, namely, that she would have consented to percutaneous pins being inserted into her wrist had she been offered that choice, that statement should not be excluded as hearsay.

B

The plaintiff next claims that the court improperly admitted certain evidence introduced by the defendant. Specifically, she claims that the court improperly admitted evidence regarding (1) the fees that Dr. Sedlin gener-

ally receives for providing deposition testimony and for testifying in court and (2) the treatment that Dr. Sedlin had provided to his wife after she had sustained a Colles' fracture of the wrist.

1

First, the plaintiff argues that it was improper and prejudicial for the court to admit evidence of the fees that her expert generally charges for deposition testimony and for testifying in court while at the same time prohibiting the plaintiff from introducing evidence of what the defendant's expert was, in fact, charging the defendant in this particular case.

Prior to trial, the plaintiff's counsel identified the portions of Dr. Sedlin's deposition testimony that he intended to have read to the jury at trial. Before identifying the portions of Dr. Sedlin's deposition testimony that the defendant's counsel sought to introduce at trial, he requested, as a professional courtesy, that the plaintiff allow the defendant's expert witness, Dr. Woodbury, to testify during the plaintiff's case because Dr. Woodbury had to leave for a scheduled ski trip. The plaintiff's counsel agreed to make that accommodation. Dr. Woodbury testified on direct and cross-examination. Thereafter, he testified in the jury's absence that he charged $500 per hour and that the defendant had paid him $1600 or $1700 to date. He further testified that the defendant owed him fees for an additional twenty hours, which was comprised of the time he spent preparing for trial and the time he had spent in court. After Dr. Woodbury left for his ski trip, defense counsel indicated the portions of Dr. Sedlin's deposition testimony that it wanted read to the jury, including Dr. Sedlin's testimony that he generally charged $500 an hour for deposition testimony and $6000 to $7500 a day for testifying in court. The trial court allowed those

portions of Dr. Sedlin's deposition testimony to be read to the jury over the plaintiff's objections.

We decline to address this claim. We do not conceive of this situation arising again on retrial because, after this experience, we do not believe it likely that the plaintiff's counsel will again extend a professional courtesy to allow the defendant's counsel to interrupt the plaintiff's case with the out of order testimony of the defendant's expert witness. That being the case, if the defendant's counsel examines the plaintiff's expert about how much he is charging for preparation and trial, the plaintiff's counsel will be able to point out to the jury during the defendant's case that, to the extent that fees give an expert an interest in the outcome of the case, the defense expert, Dr. Woodbury, also had an interest in the outcome by virtue of the fact of his professional fees charged for preparation and trial testimony.

2

Second, the plaintiff argues that it was improper for the court to admit evidence of the fact that Dr. Sedlin had treated his wife's fracture with a cast, rather than with pins. The plaintiff argues that this evidence was irrelevant and served only to distract the jury from the main issues in the case and was, therefore, improper. We disagree.

"Generally, evidence is admissible to prove a material fact that is relevant to the cause of action alleged by the plaintiff." (Internal quotation marks omitted.) *Hayes* v. *Manchester Memorial Hospital*, 38 Conn. App. 471, 474, 661 A.2d 123, cert. denied, 235 Conn. 922, 666 A.2d 1185 (1995). "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue." (Internal quotation marks omitted.) *State* v. *Nieves*, 69 Conn. App. 96, 101, 793 A.2d 290, cert. denied,

260 Conn. 930, 798 A.2d 972 (2002); see also Conn. Code Evid. § 4-1.

We conclude that evidence of the manner in which Dr. Sedlin treated his wife's fracture was relevant to one of the main issues in the case. Here, one of the central issues was whether the defendant had breached the duty of care. On the one hand, the defendant's expert, Dr. Woodbury, testified that the duty of care required that the plaintiff's fracture be treated with a cast. On the other hand, the plaintiff's expert, Dr. Sedlin, testified that the duty of care mandated that the plaintiff's fracture be treated with percutaneous pins. The credibility of the experts was, therefore, also at issue. "It is well settled that the credibility of an expert witness is a matter to be determined by the trier of fact." *Hayes* v. *Manchester Memorial Hospital*, supra, 38 Conn. App. 474. The fact that Dr. Sedlin treated his wife in a manner that was contrary to what he had asserted was mandated by the duty of care would serve to aid the jury in its determination of his credibility and it was therefore relevant.

## IV

The plaintiff next argues that the court's jury instruction was inadequate with respect to medical negligence and informed consent and that the inadequacy of the instruction was compounded by the court's refusal to utilize any of the plaintiff's requests to charge. The plaintiff further argues that the court improperly focused its jury instructions on what is not expected of physicians. We disagree.

The gist of the plaintiff's argument regarding the inadequacy of the charge was that the charge constituted forty pages of transcript, and of that forty pages, the issues of failure to treat and failure to inform constituted only six pages. As previously stated, a "charge is not to be critically dissected for purposes of discovering

possible inaccuracies . . . ." (Internal quotation marks omitted.) *Remington* v. *Aetna Casualty & Surety Co.*, supra, 240 Conn. 316. As long as the charge is "correct in law, adapted to the issues and sufficient for the guidance of the jury [the charge is not improper]." (Internal quotation marks omitted.) Id. There is no fixed formula as to the number of pages required for a charge. Furthermore, we do not agree that the court unduly focused the instruction on what is not expected of physicians.

V

We decline to address the plaintiff's remaining claims attacking the court's decision to direct a verdict on portions of the plaintiff's claims. In the course of a new trial, these claims may not arise again because the plaintiff may introduce additional evidence in support of her claims. Accordingly, we decline to consider those claims at this juncture.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.