## STATE OF CONNECTICUT *v.* ANWAR S.*
### (AC 34635)

Lavine, Alvord and Foti, Js.

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Argued December 4, 2012—officially released March 19, 2013

*Elizabeth M. Inkster*, assigned counsel, with whom was *Desmond Ryan*, certified legal intern, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Kevin D. Lawlor*, state's attorney, *Charles M. Stango*, senior assistant state's attorney, and *Melanie Cradle*, assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Anwar S., appeals from the judgment of conviction rendered following a jury trial, of one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (2) and one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (1). The defendant claims that the trial court improperly (1) denied his motion in limine to preclude laboratory results on the ground that they constituted testimonial hearsay, (2) precluded the admission of testimony pursuant to General Statutes § 54-86f regarding the past sexual history of the victim, T, and (3) denied the defendant's motion to strike evidence as irrelevant. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In 2008, T was residing in Connecticut along with her mother, her half brother and her stepfather, the defendant.[1] In or about March, 2008, T's mother found

---

[1] T's mother and the defendant were never married, but T referred to the defendant as her stepfather because he had raised her. T's half brother is the biological child of T's mother and the defendant.

her masturbating and asked T what she was doing. T stated in response, "Mom, don't get mad [at dad], but it only happened one time . . . ." An argument then ensued between T's mother and the defendant regarding whether he had engaged in inappropriate sexual conduct with T. Shortly thereafter, T and her mother moved out of the family residence, while T's half brother remained with the defendant.

In July, 2008, T returned to the defendant's home to spend time with the defendant and her half brother. During this visit the defendant sexually assaulted T by engaging in penile-rectal intercourse. After the July, 2008 visit, T relocated with her mother to Kansas and then ultimately relocated to California. Once in California, T told her mother that the defendant had assaulted her not just once, but multiple times during the three preceding years.[2]

In December, 2008, T and her mother returned to Connecticut, and in January, 2009, T's mother filed a complaint against the defendant with the police. The police department made an appointment for T to be seen at the Yale Child Sexual Abuse Clinic (clinic) for a forensic interview with a social worker. Because T reported information indicating that a medical examination should be performed, the social worker made another appointment for T to receive a medical examination at the clinic.

Janet Murphy, a pediatric nurse practitioner and the associate medical director for the clinic, conducted a medical examination of T. Murphy testified that she is a member of a multidisciplinary team (team), which is a group of professionals from different disciplines

---

[2] At the direction of the defendant, T had refrained from reporting these previous incidents of abuse. During that three year period, to deter further abuse from the defendant, T began wearing pants under her nightgowns or multiple pairs of underwear.

involved in the investigation and evaluation of child abuse and sexual abuse. Murphy's role on the team is to conduct medical evaluations of the children at the clinic. Because T reported penile penetration, Murphy obtained specimens from T's genital area to screen for sexually transmitted infections. The vaginal screening was done via a urine specimen, and the rectal screening was completed with a swab. T's urine and rectal test results indicated that she tested positive for chlamydia, a sexually transmitted infection usually acquired from sexual contact.[3]

Murphy stated that treatment, in a case involving possible sexual abuse, requires a confirmatory test to ensure that the results were not a false positive.[4] Accordingly, Murphy contacted T's mother, who had already returned to California, to inform her of T's positive test results and to make arrangements for T to be seen at a clinic in California. To facilitate T's tests, Murphy spoke with Fred Bruhn, a physician at a clinic in California, regarding T's positive results. Bruhn then set up an appointment to have T evaluated, during which she underwent confirmatory tests consisting of a vaginal swab for chlamydia culture, a rectal swab for chlamydia culture, and a repeat of the urine tests also conducted in Connecticut. The vaginal swab culture was positive, the rectal swab was negative, and the urine test was positive.[5] Murphy received a verbal report

[3] Murphy stated that chlamydia can be contracted in utero as well as through sexual contact, but that T's infection was unlikely to have resulted from the birth process, as those infections are usually discovered within the first three years of the child's life and T was twelve years old at the time of her examination.

[4] Murphy distinguished cases of sexual abuse from those in which an individual is sexually active and infected with chlamydia—in the latter instance treatment would be given without confirmatory tests.

[5] Murphy testified that the nucleic acid amplification test, conducted in California, amplifies genetic material of the organism while cultures actually grow the organism. That test is more sensitive than a culture, as it requires less of the genetic material of chlamydia to detect it.

of these results from the physicians who examined T in California. According to Murphy, "[t]he fact that the [California] tests were positive tells me chlamydia was present in the genital location of her body."

Before trial, the defendant filed a motion in limine to preclude evidence of the laboratory tests performed on T. The court denied the defendant's motion, holding that the evidence was relevant and that the probative value outweighed the danger of unfair prejudice. In so holding, the court found that "[t]he defendant's objections, as to the testing . . . the nature of the testing . . . who did the testing, and the protocols . . . [go] to the weight of the evidence . . . but does not go to the admissibility." The results of the Yale clinic tests were admitted as business records, and the results of the California tests were admitted through Murphy's testimony. Additional facts will be set forth as necessary.

I

The defendant asserts that the trial court improperly (1) admitted the Yale clinic laboratory results as physical evidence and (2) allowed Murphy to testify as to the results of the Yale and California chlamydia tests. Specifically, the defendant asserts that the results of both tests should have been precluded as testimonial hearsay under *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).[6] We disagree.

We first set forth the applicable standard of review. "Under *Crawford* v. *Washington*, supra, 541 U.S. 68, the hearsay statements of an unavailable witness that are testimonial in nature may be admitted under the sixth amendment's confrontation clause only if the defendant has had a prior opportunity to cross-examine

---

[6] The defendant did not claim that the laboratory results were otherwise inadmissible.

the declarant. Hearsay statements that are nontestimonial in nature are not governed by the confrontation clause, and their admissibility is governed solely by the rules of evidence. . . . Thus, the threshold inquiry for purposes of the admissibility of such statements under the confrontation clause is whether they are testimonial in nature. Because this determination is a question of law, our review is plenary . . . .

"In *Crawford*, the Supreme Court declined to spell out a comprehensive definition of testimonial . . . . Instead, the court defined a testimonial statement in general terms: A solemn declaration or affirmation made for the purpose of establishing or proving some fact. . . . The court did note, however, three formulations of th[e] core class of testimonial statements . . . [1] ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . [and 3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . . *State* v. *Slater*, [285 Conn. 162, 169–70, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008)].

"[I]n *Davis* v. *Washington*, [547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)] the United States Supreme Court elaborated on the third category and applied a primary purpose test to distinguish testimonial from nontestimonial statements given to police officials, holding: Statements are nontestimonial when

made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *State* v. *Smith*, 289 Conn. 598, 623, 960 A.2d 993 (2008). Our Supreme Court reaffirmed this precedent by holding that whether a statement is testimonial in nature *focuses on the reasonable expectation of the declarant* that, under the circumstances, his or her words later could be used for prosecutorial purposes." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Brown*, 112 Conn. App. 131, 134–36, 961 A.2d 481 (2009); see also *State* v. *Slater*, supra, 285 Conn. 172 ("it is clear that much of the Supreme Court's and our own jurisprudence applying *Crawford* largely has focused on the reasonable expectation of the declarant that, under the circumstances, his or her words later could be used for prosecutorial purposes").

Addressing the defendant's claims in turn, we first discuss whether the Yale clinic test results were testimonial in nature and, thus, whether their admission violated the defendant's right to confront witnesses against him. The defendant argues that the reports in the present case are analogous to those in *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), and *Bullcoming* v. *New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), and therefore fall within the core class of testimonial statements. We disagree.

Our inquiry turns on the reasonable expectation of the laboratory analysts, who prepared the report, under the circumstances in this case. See *State* v. *Slater*, supra,

285 Conn. 172. That the laboratory report also serves a forensic purpose is insufficient to render it testimonial. In fact, there is no requirement that the laboratory results serve *exclusively* a medical purpose, but instead *Davis* requires a primarily nonevidentiary purpose. See *State* v. *Arroyo*, 284 Conn. 597, 632 n.20, 935 A.2d 975 (2007) ("[r]equiring that [the medical examination] serve an exclusively medical purpose in order to be considered nontestimonial . . . is simply not based on an accurate reading of *Davis*").

In *Melendez-Diaz*, the police seized several small plastic bags containing cocaine from the defendant's car and submitted these bags to a state laboratory for chemical analysis. *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 308. The certificates of analysis reported the weight of the bags as well as the substance found within. Id. The analysts who prepared the report were employed by a state laboratory and swore to the certificates before a notary public. Id. During trial, the prosecution submitted these certificates of analysis into evidence. Id., 309. The United States Supreme Court concluded that these documents were testimonial in nature. Id., 310. Although denominated "certificates," the reports were clearly affidavits that were made for the purpose of establishing some fact and, as such, "[w]ere functionally identical to live, in-court testimony." Id., 310–11.

Similarly, in *Bullcoming*, the results of the defendant's blood alcohol concentration test were introduced during trial through the live testimony of an analyst who did not perform the test. *Bullcoming* v. *New Mexico*, supra, 564 U.S. 651. The arresting officer obtained the defendant's blood sample pursuant to a warrant and witnessed the blood draw. Id., 653. The law enforcement officer then provided this seized evidence to a state laboratory. Id. The laboratory's report contained information filled in by the arresting officer, the

reason the suspect was stopped by the officer and the time the blood was drawn. Id. The laboratory report referred to various court rules regarding the admission of certified blood alcohol analyses and presented a certificate of the analyst who tested the sample, which affirmed the blood alcohol level, that the seal of the sample was intact when received, that the analyst's statements were correct and that the results were obtained by following the proper procedures. Id., 653, 665. The court, in *Bullcoming*, recognized that "[a]n analyst's certification prepared in connection with a criminal investigation . . . is 'testimonial,' and therefore within the compass of the Confrontation Clause." Id., 658–59. Although the absence of an oath is not dispositive, the certificate in *Bullcoming* closely resembled the certificate in *Melendez-Diaz*, as the analyst's certificate was formalized in a signed document reporting results pertaining to seized evidence provided by a law enforcement officer. The presence of such formalities was sufficient to qualify the analyst's assertions as testimonial.

The laboratory results submitted into evidence in this case are distinguishable from the aforementioned cases in light of law enforcement's limited involvement in facilitating the testing. In the present case, the analysis was requested by Murphy, a medical staff member,[7]

---

[7] We disagree with the defendant's assertion that Murphy, as a member of the team established pursuant to General Statutes § 17a-106a, was operating as law enforcement personnel. Our Supreme Court has observed that "[t]he stated purposes of the[se] multidisciplinary teams includes the advancement and coordination of the prompt investigation of suspected cases of child abuse, but also includes *the goals of reducing the trauma to the child victim and ensuring the protection and treatment of the child victim*." (Emphasis added.) *State* v. *Arroyo*, supra, 284 Conn. 634. "The mere fact that police are involved . . . because they are made privy to the information obtained . . . is not sufficient, without more, to render the [statements] testimonial." Id., 632 n.20. Similarly, in *Slater*, our Supreme Court held that the statements made to health care personnel are not automatically testimonial merely because the medical personnel were members of a team, organized pursuant to General Statutes § 19a-112a, that also

rather than a law enforcement officer. Although a detective first referred T to the clinic for a forensic interview, it was the social worker who referred T to Murphy. Murphy conducted a medical examination, during which she collected specimens for testing, which were then examined by the analyst who ultimately prepared the report. Furthermore, the specimens in the present case were not seized by law enforcement, and the officers neither witnessed the collection of the specimens nor completed the laboratory request forms. Finally, the laboratory and its analysts are affiliated with Yale-New Haven Hospital rather than a state laboratory mandated to perform such analyses at the request of law enforcement. Given the attenuated nature of law enforcement's involvement, the laboratory analysts, having received the request from a medical staff member, would not reasonably expect that the report would be used for a prosecutorial purpose.

Although the absence of an oath is not dispositive in determining whether a statement is testimonial, we conclude that the laboratory report in the present case lacks the indicia of formality that were present in both *Melendez-Diaz* and *Bullcoming*, and, thus, was not a testimonial statement. In this case, the report provided information including the patient's name, the specimen source, the results of the analyses, the dates and time the specimens were collected and received, and the date and time the results were reported. The report, however, did not provide information regarding admissibility of laboratory results, it was not notarized and

included law enforcement officers. *State* v. *Slater*, supra, 285 Conn. 184 n.14. In the present case, Murphy examined T and ordered various tests for medical purposes, distinct from law enforcement's investigatory objectives. Indeed, "[an assault victim] is necessarily in need of medical attention." Id., 185. We conclude that Murphy's status as a team member is insufficient, by itself, to render her law enforcement personnel and, thus, the laboratory results in this case were not generated at the behest of law enforcement.

it did not bear any form of certification as to the accuracy of the analyst's statements or the procedures used. Moreover, the report was devoid of any accusatory information such as the defendant's identity or details regarding T's contraction of the infection. These circumstances, viewed objectively, would not have led the analyst reasonably to believe that his or her statements in the laboratory report would later be used at trial. For the foregoing reasons, we conclude that the analyst's statements were not testimonial in nature and, thus, the confrontation clause was not implicated.

We next address the defendant's claim that the California clinic test results, admitted through Murphy's testimony during trial, were testimonial in nature and, thus, their admission violated his constitutional right to confrontation. We conclude that the circumstances under which the California results were generated would not have led the analysts reasonably to believe that this report would be used primarily for prosecutorial purposes.

As with the Yale tests, law enforcement's involvement in initiating the California tests was attenuated at best. Murphy initiated the laboratory analyses when she referred T to Bruhn for confirmatory testing and treatment. Specimens were then collected at the California clinic and sent to a laboratory for analysis, and the results were ultimately reported by a laboratory analyst to the California clinic. In the context of multiple technicians working on a DNA profile, the United States Supreme Court has observed that "[w]hen the work of a lab is divided up [among multiple persons] it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures." *Williams* v. *Illinois*, U.S. , 132 S. Ct. 2221, 2244, 183 L. Ed. 2d 89 (2012). We find this principle instructive in the present case. Akin to the

multiple technicians in *Williams*, the laboratory analysts in this case, having received the request from a physician in California that stemmed from several previous referrals, reasonably could have understood the request to be for a medical purpose and, thus, performed their isolated tasks accordingly without any further consideration.

Although the state concedes that the California reports serve a dual medical-prosecutorial purpose, the defendant has not pointed us to any evidence in the record that the laboratory analysts understood the request as such. Murphy testified that T's laboratory results were reported to her verbally by T's physician and not the laboratory analysts. These circumstances lessen the likelihood that the analysts were aware of either Murphy's or Connecticut law enforcement's involvement. Moreover, although this test served a dual purpose of confirming the Yale clinic results and providing medical treatment to T, Murphy's testimony is devoid of any evidence that the California laboratory results bore the indicia of formality sufficient to render the results a solemn declaration and, consequently, testimonial. See *Bullcoming* v. *New Mexico*, supra, 564 U.S. 647; *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 305. Because we conclude that the statements were not testimonial, their admission into evidence did not violate the defendant's right to confrontation.[8]

## II

The defendant next asserts that the trial court abused its discretion in precluding the admission of evidence

---

[8] Our decision today obviously does not eliminate the possibility that, under a different set of facts, a laboratory technician performing the analysis reasonably could know that the results were intended for use in a criminal prosecution or that the primary purpose of the laboratory analysis was to establish or prove some fact in a criminal proceeding. A record that reflected such facts would be distinguishable from the record in this case and may produce a different outcome.

pursuant to § 54-86f indicating that T had sexual contact with an individual other than the defendant. Specifically, the defendant claims that the exclusion of this evidence violated his constitutional rights to confrontation, cross-examination, compulsory process, due process, a fair trial and to present a defense by (1) preventing him from showing an alternate source for T's sexually transmitted disease, (2) preventing him from providing an alternate source for T's sexual knowledge (the mother's observations of T's masturbation) and (3) eliminating a line of questions regarding T's and her mother's credibility regarding motive, bias and interest. The following additional facts and procedural history are relevant to our resolution of this claim.

The state filed a motion in limine to preclude evidence regarding T's collateral disclosures of a separate incident of sexual abuse committed by an individual referred to as "Uncle J.B." The parties do not dispute that T, while residing in California, was sexually assaulted by Uncle J.B. in the latter half of 2008. T disclosed the incident, but the allegations were not pursued by her family or the California authorities. The state argued that because T's allegations regarding Uncle J.B. involved both parties being fully clothed, the collateral allegation was not relevant as a means of explaining T's chlamydia, and its admission would therefore prejudice T and confuse the jury.

The defendant filed an opposition to the state's motion in limine and a motion to admit this evidence pursuant to § 54-86f. Specifically, the defendant argued that the collateral disclosures were relevant evidence regarding an alternative source for T's advanced sexual knowledge and her sexually transmitted disease, as well as a means of questioning T's and her mother's credibility due to motive, bias or interest. The defendant also asserted that the assault committed by Uncle J.B. was relevant to his claim of actual innocence by establishing

that T's subsequent conduct was inconsistent with the defendant's having assaulted her.[9]

The court granted the state's motion in limine, thereby precluding evidence regarding the sexual assault committed by Uncle J.B. In reaching its conclusion, the court found the timing of Uncle J.B.'s assault relevant. The court understood the facts as follows: "[I]n May of 2008, [T's mother] discovered her engaging in certain behavior that led her to question her daughter . . . [and shortly thereafter T] had disclosed [to her mother] what had happened to her at the hands of the defendant. [The] [m]other moved out of the house, and, eventually, moved to other states." The court found that "Uncle J.B. could not have been the source of knowledge of other behavior because when [T] disclosed [the assault committed by the defendant] to the mother, she hadn't even met Uncle J.B., at that point and time." The court further concluded, based on the attorneys' recitation of the facts, that Uncle J.B. could not have been the source of chlamydia because T had her clothes on during the incident. The court specifically held that it found the probative value of this evidence, as a potential alternate source for T's advanced sexual knowledge and sexually transmitted disease, "to be extremely, extremely, low [due] to the fact that it does not have probative value [and has] prejudicial effect outweighing any probative value."

As a preliminary matter we set forth the appropriate standard of review that will guide our analysis. "We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law . . . for an abuse of discretion. *State* v. *Saucier*, 283 Conn.

---

[9] The defendant specifically refers to T's subsequent conduct of contacting the defendant for help after Uncle J.B. assaulted her. During trial, testimony was given that T did contact the defendant for help while she was residing in California without stating the reason T initiated the contact.

207, 218, 926 A.2d 633 (2007). We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. *State* v. *Snelgrove*, 288 Conn. 742, 758, 954 A.2d 165 (2008). The trial court has wide discretion to determine the relevancy [and admissibility] of evidence . . . . *State* v. *Johnson*, 289 Conn. 437, 462, 958 A.2d 713 (2008). In order to establish reversible error on an evidentiary impropriety . . . the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." (Internal quotation marks omitted.) *State* v. *Cecil J.*, 291 Conn. 813, 818–19, 970 A.2d 710 (2009).

The rape shield statute, § 54-86f, limits the use of the victim's prior sexual conduct. Section 54-86f provides in relevant part: "[N]o evidence of the sexual conduct of the victim may be admissible unless such evidence is (1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of . . . disease . . . or (4) otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. Such evidence shall be admissible only after a hearing on a motion to offer such evidence containing an offer of proof. . . ."

"The rape shield statute directs the court to examine the defendant's constitutional rights, implicating both his sixth amendment right to confront witnesses and his fourteenth amendment due process right to call witnesses on his own behalf. . . . [T]he right to confront and to cross-examine victims of sexual assault about their sexual histories is not absolute and may bow to accommodate other legitimate interests. . . . One of the legitimate interests is the court's right, indeed, duty, to exclude irrelevant evidence. . . . If the court determines that the proffered evidence is not relevant, the defendant's right to present witnesses in

his own behalf has not been affected and the evidence can properly be excluded." (Citations omitted; internal quotation marks omitted.) *State* v. *Farah*, 126 Conn. App. 437, 450–51, 13 A.3d 1108, cert. denied, 300 Conn. 931, 17 A.3d 68 (2011).

"A defendant who seeks to introduce evidence under one of the exceptions of § 54-86f must first make an offer of proof. *State* v. *Cecil J.*, 99 Conn. App. 274, 280–81, 913 A.2d 505 (2007), aff'd, 291 Conn. 813, 970 A.2d 710 (2009). . . . Offers of proof are allegations by the attorney . . . in which he represents to the court that he could prove them if granted an evidentiary hearing. . . . The purpose of an offer of proof has been well established by our courts. First, it informs the court of the legal theory under which the evidence is admissible. Second, it should inform the trial judge of the specific nature of the evidence so that the court can judge its admissibility. Third, it creates a record for appellate review. . . . Additionally, an offer of proof should contain specific evidence rather than vague assertions and sheer speculation. . . . [T]he defendant bears the burden of establishing the relevance of proffered testimony." (Citations omitted; internal quotation marks omitted.) *State* v. *Martinez*, 295 Conn. 758, 771, 991 A.2d 1086 (2010).

"A clear statement of the defendant's theory of relevancy is all important in determining whether the evidence is offered for a permissible purpose. *State* v. *Sullivan*, 244 Conn. 640, 647, 712 A.2d 919 (1998). . . . [I]n order for evidence of a victim's prior sexual conduct to be admissible under § 54-86f to show a source for the victim's sexual knowledge, [p]rior to trial the defendant must make an offer of proof showing: (1) that the prior acts clearly occurred; (2) that the acts closely resembled those of the present case; (3) that the prior act is clearly relevant to a material issue; (4) that the evidence is necessary to [the] defendant's case; and (5) that the

probative value of the evidence outweighs its prejudicial effect." (Citation omitted; internal quotation marks omitted.) *State* v. *Cecil J.*, supra, 291 Conn. 825.

We first address whether the court abused its discretion by precluding the proffered evidence, on the ground that it had little probative value, which was outweighed by its prejudicial effect. The defendant argues that the court improperly credited the state's representation of the facts in reaching its conclusion that the assault committed by Uncle J.B. could not have been the source for T's sexually transmitted disease or advanced sexual knowledge. The state, however, contends that the defendant failed to make an offer of proof sufficient to establish relevancy. We agree with the state and conclude that the trial court did not abuse its discretion.

The defendant's assertion that he was unable to meaningfully contest the state's version of events because the assault committed by Uncle J.B. was not further investigated is unavailing. The defendant bears the burden of establishing the relevance of the proffered testimony by making an offer of proof informing the court of the specific nature of the evidence, rather than making vague or speculative assertions. *State* v. *Martinez*, supra, 295 Conn. 771–72. The defendant asserted that because Uncle J.B. assaulted T, he could have been the source of T's infection and advanced sexual knowledge and, therefore, a good faith inquiry was warranted due to the lack of evidence pertaining to the assault.[10]

---

[10] Defense counsel argued to the court: "We don't know the risks because there wasn't [an] investigation. . . . [T]he state is asking you to infer [that T] must have told the truth . . . about what happened in California. And to further assume it is . . . the whole truth . . . even though California then didn't investigate it further. . . . I don't know . . . as to how many other nights he had access . . . . I don't know how many opportunities he had during that time period [that T] was in California . . . . That's why I would make inquiry . . . ."

Such an assertion, however, is speculative, as the record reveals that the defendant failed to provide specific evidence to refute the state's representation of the chronological order of events and the distinguishable nature of the assault. As the state aptly noted, defense counsel did not embellish his proffer by calling any witnesses outside the presence of the jury or claiming that the state hampered his efforts to make a proffer. The trial court was within its discretion to conclude that (1) the collateral assault could not be the source of T's sexual knowledge because T had not yet met Uncle J.B. at the time her mother found her masturbating and (2) that because the nature of the collateral assault differed from the one at bar, as it did not involve the type of genital contact necessary to transmit chlamydia, it could not serve as an alternate source for T's sexually transmitted infection. We therefore conclude that the court did not abuse its discretion by precluding inquiry into the collateral sexual assault, as it was not relevant to any critical issue in the present case.[11]

---

[11] The defendant's assertion that the evidence was admissible to prove third party culpability is similarly unpersuasive. "It is well established that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged. . . . The defendant must, however, present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused. . . .

"The admissibility of evidence of third party culpability is governed by the rules relating to relevancy." (Citation omitted; internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 514, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009). Although the parties concede that T was sexually assaulted by Uncle J.B. in California, we conclude that the defendant's vague assertions are insufficient to directly connect Uncle J.B. to the conduct with which the defendant was charged. The collateral assault committed by Uncle J.B. differed substantially from the crimes with which the defendant was charged, as T alleged that she remained clothed during the incident with Uncle J.B. and there was neither vaginal nor anal penetration. Furthermore, the collateral assault occurred in the latter half of 2008 after T had demonstrated advanced sexual knowledge and after the defendant

## III

The defendant finally claims that the trial court erred by refusing to strike the chlamydia evidence as irrelevant or, alternatively, that the evidence was unfairly prejudicial. We disagree. The following facts and procedural history are relevant to our resolution of this claim.

The defendant filed a motion to strike and for a curative instruction pertaining to all testimony relating to T's chlamydia testing and positive results on the grounds that the evidence was irrelevant and more prejudicial than probative. Specifically, the defendant claimed that the state failed to establish any link between him and the condition of T because no evidence was offered to connect him to the transmission of the disease and T's sexual history was speculative.[12] The court denied the motion, reasoning "that the evidence, as to chlamydia, [was] probative as to the [child's report of] having sexual contact . . . ." The court further noted that the state, during its closing argument, could represent only that T had chlamydia and not that the defendant was the source, "because that would be speculative."

It is well established that "[t]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the

---

had assaulted her. In light of these considerations we conclude that the court did not abuse its discretion in precluding the proffered testimony.

[12] During oral argument, the defendant asserted that the state specifically declined to elicit testimony from T during its direct examination regarding whether she had sexual contact with any other individual and that the expert testimony indicated that T's infection could have been contracted as recently as a few days before her tests or as long ago as prenatally. The defendant asserted that the inference that T contracted chlamydia from him is speculative and therefore must be stricken.

trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." *State* v. *McClelland*, 113 Conn. App. 142, 156, 965 A.2d 586, cert. denied, 291 Conn. 912, 969 A.2d 176 (2009).

We readily conclude that the court properly determined that the evidence was relevant and probative as to T's having had sexual contact. See Conn. Code Evid. § 4-1. "A relevant fact is one that has a logical tendency to aid the trier in the determination of an issue. . . . *Raybeck* v. *Danbury Orthopedic Associates, P.C.*, 72 Conn. App. 359, 378, 805 A.2d 130 (2002). No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason and judicial experience." (Internal quotation marks omitted.) *Harrison* v. *Hamzi*, 77 Conn. App. 510, 516–17, 823 A.2d 446, cert. denied, 266 Conn. 905, 832 A.2d 69 (2003). Whether the defendant sexually assaulted T was a disputed, material issue of fact. T was diagnosed with chlamydia, which, according to expert testimony, is transmitted most commonly through sexual contact and requires some degree of penetration by an individual infected by the disease. T testified that she had sexual contact with the defendant when he assaulted her, penetrating her vaginally and anally. Furthermore, T's medical records provided that she was not sexually active. Because T's diagnosis logically tended to prove that she had sexual contact with an individual, the evidence that she had the requisite contact only with the defendant made it more likely that the defendant engaged in the conduct with which he was charged.

The defendant alternatively asserts that evidence pertaining to T's chlamydia diagnosis was unfairly prejudicial, as it had an adverse effect on the defendant beyond tending to prove that T had sexual contact. See *State*

v. *James G.*, 268 Conn. 382, 399, 844 A.2d 810 (2004) ("evidence is excluded as unduly prejudicial when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence" [internal quotation marks omitted]). Specifically, the defendant claims that the evidence compelled the jury to speculate that he was also infected with chlamydia. We are not persuaded. This evidence, by itself, was probative of the fact that T had the type of sexual contact with an individual necessary to transmit the infection and does not lead us to conclude that it was unfairly prejudicial. Furthermore, by the time the jury heard testimony regarding T's diagnosis, T had already testified specifically that she was sexually assaulted by the defendant, and her mother's testimony corroborated T's report of the incident. See id., 400 (evidence less likely to unduly arouse jurors' emotions when similar evidence has already been presented to jury). The evidence pertaining to chlamydia was consistent with other evidence presented by the state at trial, and we cannot conclude that its admission was unfairly prejudicial to the defendant. For the foregoing reasons we conclude that the trial court did not abuse its discretion in denying the defendant's motion to strike.[13]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[13] Relying on out-of-state jurisprudence, the defendant invites us to expand upon the categories set forth in § 4-3 of our code of evidence, asserting that the admission of evidence encouraging the jury to find guilt on an improper basis also results in unfair prejudice. We decline to do so.