******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# ANWAR S. *v.* COMMISSIONER OF CORRECTION[*]
## (AC 47274)

Suarez, Seeley and Wilson, Js.

*Syllabus*

The petitioner, who previously had been convicted of, inter alia, sexual assault in the first degree, appealed following the denial of his petition for certification to appeal from the habeas court's judgment dismissing in part and denying in part his petition for a writ of habeas corpus. The petitioner claimed, inter alia, that the habeas court improperly dismissed his claim that certain evidence admitted in his criminal trial was testimonial hearsay and that its admission deprived the petitioner of his constitutional right to confrontation. *Held*:

The habeas court did not abuse its discretion in denying the petition for certification to appeal, as the petitioner failed to demonstrate that the issues raised were debatable among jurists of reason, that a court could resolve them in a different manner, or that the questions were adequate to deserve encouragement to proceed further.

The habeas court properly dismissed the petitioner's claim alleging a violation of his constitutional right to confrontation on the ground of res judicata, as that claim was previously asserted and adjudicated fully on the merits in his direct appeal and the petitioner failed to state new facts or to proffer new evidence that was not reasonably available to him when he filed his direct appeal.

Argued March 20, 2025—officially released January 13, 2026

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Newson, J.*; judgment dismissing

---

[*]In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the petitioner's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2024); we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

in part and denying in part the petition; thereafter, the court, *Newson, J.*, denied the petition for certification to appeal, and the petitioner appealed to this court. *Appeal dismissed.*

*Naomi T. Fetterman*, for the appellant (petitioner).

*Rebecca R. Zeuschner*, deputy assistant state's attorney, with whom, on the brief, were *Margaret E. Kelley*, state's attorney, and *Erin Elizabeth Stack*, assistant state's attorney, for the appellee (respondent).

*Opinion*

SUAREZ, J. The petitioner, Anwar S., appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying in part and dismissing in part his fourth amended petition for a writ of habeas corpus. The petitioner claims that the court (1) abused its discretion in denying his petition for certification to appeal and (2) improperly dismissed his claim in count three of the amended petition that he was deprived of his constitutional right to confrontation on the ground of res judicata. We conclude that the habeas court properly denied the petition for certification to appeal and, therefore, dismiss this appeal.

The following facts and procedural history as gleaned from the record and as previously set forth by this court on the petitioner's direct appeal are relevant to the claims raised on appeal. On February 17, 2011, following a jury trial, the petitioner was found guilty of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), risk of injury to a child in violation of General Statutes § 53-21 (a) (2), and risk of injury to a child in violation of § 53-21 (a) (1). The trial court imposed a total effective sentence of fifteen years of incarceration, followed by ten years of special parole. Thereafter, the petitioner brought a direct appeal, and this court set forth the following facts underlying the petitioner's criminal

conviction, which the jury reasonably could have found on the basis of the evidence presented. "In 2008, T was residing in Connecticut along with her mother, her half brother and her stepfather, [the petitioner]. In or about March, 2008, T's mother found her masturbating and asked T what she was doing. T stated in response, 'Mom, don't get mad [at dad], but it only happened one time . . . .' An argument then ensued between T's mother and [the petitioner] regarding whether he had engaged in inappropriate sexual conduct with T. Shortly thereafter, T and her mother moved out of the family residence, while T's half brother remained with [the petitioner].

"In July, 2008, T returned to [the petitioner's] home to spend time with [the petitioner] and her half brother. During this visit [the petitioner] sexually assaulted T by engaging in penile-rectal intercourse. After the July, 2008 visit, T relocated with her mother to Kansas and then ultimately relocated to California. Once in California, T told her mother that [the petitioner] had assaulted her not just once, but multiple times during the three preceding years.

"In December, 2008, T and her mother returned to Connecticut, and, in January, 2009, T's mother filed a complaint against [the petitioner] with the police. The police department made an appointment for T to be seen at the Yale Child Sexual Abuse Clinic (clinic) for a forensic interview with a social worker. Because T reported information indicating that a medical examination should be performed, the social worker made another appointment for T to receive a medical examination at the clinic.

"Janet Murphy, a pediatric nurse practitioner and the associate medical director for the clinic, conducted a medical examination of T. Murphy testified that she is a member of a multidisciplinary team . . . which is a group of professionals from different disciplines involved in the investigation and evaluation of child abuse and sexual

abuse.[1] Murphy's role on the team is to conduct medical evaluations of the children at the clinic. . . . Murphy obtained specimens from T's genital area to screen for sexually transmitted infections. The vaginal screening was done via a urine specimen, and the rectal screening was completed with a swab. T's urine and rectal test results indicated that she tested positive for chlamydia, a sexually transmitted infection usually acquired from sexual contact.

"Murphy stated that treatment, in a case involving possible sexual abuse, requires a confirmatory test to ensure that the results were not a false positive. Accordingly, Murphy contacted T's mother, who had already returned to California, to inform her of T's positive test results and to make arrangements for T to be seen at a clinic in California. To facilitate T's tests, Murphy spoke with Fred Bruhn, a physician at a clinic in California, regarding T's positive results. Bruhn then set up an appointment to have T evaluated, during which she underwent confirmatory tests consisting of a vaginal swab for chlamydia culture, a rectal swab for chlamydia culture, and a repeat of the urine tests also conducted

[1]General Statutes § 17a-106a establishes multidisciplinary teams for the purpose of investigating and prosecuting allegations of child abuse, and provides in relevant part: "(c) Each multidisciplinary team shall consist of at least one representative of each of the following: (1) The state's attorney of the judicial district of the multidisciplinary team, or such state's attorney's designee; (2) the Commissioner of Children and Families, or the commissioner's designee; (3) the heads of the local or state law enforcement agencies, or such heads' designees; (4) a health care professional with substantial experience in the diagnosis and treatment of abused or neglected children . . . (5) a member, where appropriate, of a youth service bureau; (6) a mental health professional with substantial experience in the treatment of abused or neglected children . . . (7) a forensic interviewer . . . (8) a victim advocate . . . and (9) any other appropriate individual with expertise in the welfare of children that the members of the multidisciplinary team deem necessary. . . ."

Although the legislature has amended § 17a-106a since the events underlying this case; see, e.g., Public Acts 2017, No. 17-190; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

in Connecticut. The vaginal swab culture was positive, the rectal swab was negative, and the urine test was positive." (Footnote added; footnotes omitted.) *State* v. *Anwar S.*, 141 Conn. App. 355, 357–59, 61 A.3d 1129, cert. denied, 308 Conn. 936, 66 A.3d 499 (2013).

The petitioner asserted three claims in his direct appeal, only one of which is relevant to the issues presented in the present appeal. Specifically, the petitioner claimed that the trial court improperly denied his motion in limine[2] to preclude the Yale clinic and California laboratory test results on the ground that they constituted testimonial hearsay and, therefore, that their admission violated his confrontation clause rights. Id., 357. This court concluded that the laboratory test results were not testimonial hearsay. Id., 360.

In rejecting the petitioner's claim, this court noted that, under *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), "[h]earsay statements that are nontestimonial in nature are not governed by the confrontation clause, and their admissibility is governed solely by the rules of evidence. . . . Thus, the threshold inquiry for purposes of the admissibility of such statements under the confrontation clause is whether they are testimonial in nature. . . .

"In *Crawford*, the Supreme Court declined to spell out a comprehensive definition of testimonial . . . . Instead, the court defined a testimonial statement in general terms: A solemn declaration or affirmation made for the purpose of establishing or proving some fact. . . .

---

[2] Prior to commencement of the petitioner's criminal trial, defense counsel, Attorney John R. Gulash, filed a motion in limine to preclude the admission of the laboratory test results. The court denied the petitioner's motion, concluding that the evidence was relevant and that its probative value outweighed the danger of unfair prejudice. The Yale clinic test results were admitted into evidence as business records, and the California tests results were admitted through Murphy's testimony. *State* v. *Anwar S.*, supra, 141 Conn. App. 360.

The court did note, however, three formulations of th[e] core class of testimonial statements . . . [1] ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . [and 3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . .

"[I]n *Davis* v. *Washington* [547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)] the United States Supreme Court elaborated on the third category and applied a primary purpose test to distinguish testimonial from nontestimonial statements given to police officials, holding: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. . . . Our Supreme Court reaffirmed this precedent by holding that whether a statement is testimonial in nature *focuses on the reasonable expectation of the declarant* that, under the circumstances, his or her words later could be used for prosecutorial purposes." (Emphasis in original; internal quotation marks omitted.) *State* v. *Anwar S.*, supra, 141 Conn. App. 360–62.

This court noted that the question of whether the laboratory test results were testimonial "turn[ed] on the

reasonable expectation of the laboratory analysts, who prepared the report, under the circumstances in this case. . . . That the laboratory report also serves a forensic purpose is insufficient to render it testimonial. In fact, there is no requirement that the laboratory results serve *exclusively* a medical purpose, but instead *Davis* requires a primarily nonevidentiary purpose." (Citation omitted; emphasis in original.) Id., 362–63.

With respect to the Yale clinic test results, this court concluded that the laboratory test was "requested by Murphy, a medical staff member,[3] rather than a law enforcement officer. Although a detective first referred T to the clinic for a forensic interview, it was the social worker who referred T to Murphy. Murphy conducted a medical examination, during which she collected specimens for testing, which were then examined by the analyst who ultimately prepared the report. Furthermore, the specimens in the present case were not seized by law enforcement, and the officers neither witnessed the collection of the specimens nor completed the laboratory request forms. Finally, the laboratory and its analysts

[3] On direct appeal, the petitioner argued that Murphy, as a member of the multidisciplinary team established pursuant to General Statutes § 17a-106a, was operating as law enforcement personnel. This court rejected that assertion and noted that "[o]ur Supreme Court has observed that [t]he stated purposes of [multidisciplinary teams established pursuant to § 17a-106a] includes the advancement and coordination of the prompt investigation of suspected cases of child abuse, but also includes *the goals of reducing the trauma to the child victim and ensuring the protection and treatment of the child victim*. . . . The mere fact that police are involved . . . because they are made privy to the information obtained . . . is not sufficient, without more, to render the [statements] testimonial. . . . Murphy examined T and ordered various tests for medical purposes, distinct from law enforcement's investigatory objectives. Indeed, [an assault victim] is necessarily in need of medical attention. . . . We conclude that Murphy's status as a team member is insufficient, by itself, to render her law enforcement personnel and, thus, the laboratory results in this case were not generated at the behest of law enforcement." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Anwar S.*, supra, 141 Conn. App. 364 n.7.

are affiliated with Yale-New Haven Hospital rather than a state laboratory mandated to perform such analyses at the request of law enforcement. Given the attenuated nature of law enforcement's involvement, the [Yale clinic] laboratory analysts, having received the request from a medical staff member, would not reasonably expect that the report would be used for a prosecutorial purpose." (Footnote altered.) Id., 364–65.

With respect to the California laboratory test results, this court concluded that, "[a]s with the Yale [clinic] tests, law enforcement's involvement in initiating the California tests was attenuated at best. Murphy initiated the laboratory analyses when she referred T to Bruhn for confirmatory testing and treatment. Specimens were then collected at the California clinic and sent to a laboratory for analysis, and the results were ultimately reported by a laboratory analyst to the California clinic . . . . [T]he laboratory analysts in this case, having received the request from a physician in California that stemmed from several previous referrals, reasonably could have understood the request to be for a medical purpose and, thus, performed their isolated tasks accordingly without any further consideration." (Citation omitted.) Id., 366–67.

On September 15, 2016, the petitioner filed the underlying petition for a writ of habeas corpus, his second petition.[4] In count three of the operative fourth amended petition dated June 13, 2023,[5] the petitioner alleged that

---

[4] In June, 2013, the petitioner filed his first petition for a writ of habeas corpus challenging his conviction. In that matter, he alleged ineffective assistance of his criminal trial counsel, Attorney John R. Gulash and Attorney Diane Polan. The petition was denied. The petitioner filed an appeal from that denial, but the record reflects that this appeal was withdrawn on April 5, 2017.

[5] The operative petition alleged a "violation of due process by the presentation of false evidence in count one, [a] violation of due process by failure to disclose 'favorable evidence' in count two, [a] violation of his right to confrontation in count three, ineffective assistance of

the California laboratory test results were testimonial hearsay and that their admission violated his constitutional right to confront witnesses against him under the confrontation clause of the sixth amendment to the United States constitution and article first, §§ 8 and 9, of the Connecticut constitution.[6] Specifically, the petitioner claimed that "[t]he record from the petitioner's criminal trial did not adequately reflect . . . Murphy's involvement with the criminal investigation into the petitioner, including Murphy's relaying of laboratory test results to police officials . . . ." The petitioner asserted that "Murphy's testimony at the criminal trial was unclear or misleading about when and how she received the California test results" and that "[n]either defense counsel nor the prosecuting authority sufficiently clarified Murphy's testimony about the California test results . . . and the consequence of this lack of clarification was that the record relied upon by the Appellate Court . . . did not provide a full and fair opportunity for adjudication of this claim." (Citation omitted.) The respondent, the Commissioner of Correction, filed a return generally denying the allegations in the petition. Relying on this court's decision in the petitioner's direct appeal, the respondent raised the special defense of res judicata as to count three. The petitioner, in his reply to the respondent's special defense, argued that the doctrine of res judicata was inapplicable because he "did not receive a full and fair

[Attorney John R.] Gulash in count four, and ineffective assistance of habeas counsel [from his first habeas action] against Attorney [James] Mortimer in count five." (Footnote omitted.) The court dismissed count three of the operative petition and denied the remaining counts. On appeal, the petitioner challenges only the court's judgment dismissing count three of the operative petition.

[6] Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

hearing on this claim in **[***State* v. *Anwar S.*, supra, 141 Conn. App. 368–70]** or in his underlying criminal trial, because there is newly discovered evidence that was not disclosed to the petitioner or his counsel, or otherwise reasonably available to the petitioner, at the time of his criminal trial.''

A trial was held before the habeas court, *Newson*, *J.*, on July 25 and 26, 2023. At trial, the petitioner presented testimony from, inter alios, Murphy, Attorney John R. Gulash, Detective Charles M. Stankye III, and the petitioner. Various exhibits were also introduced. Relevant to this appeal, the respondent introduced two exhibits. Exhibit A is the redacted copy of the California laboratory test results in the police investigative file. Exhibit B is a redacted copy of the entire police investigative file, including its copy of the California laboratory test results. Both exhibit A and exhibit B contained a facsimile cover sheet (fax cover sheet).[7] The fax cover sheet included the following handwritten notation:

"2/10/09                           09-154

"Atten: Det Stankye

"From: Janet Murphy . . .

"re: lab results [of T]

"F/u visit in California.''

At the habeas trial, Murphy testified, consistent with her testimony at the criminal trial, as to her role in the investigation and her communications with the

_____

[7] In its memorandum of decision, the habeas court refers to the fax cover sheet attached to exhibit A. In their appellate briefs before this court, the parties refer to the fax cover sheet attached to exhibit A. During direct examination of Stankye, however, the petitioner's counsel referred to the fax cover sheet attached to exhibit B, which is a copy of the fax cover sheet in exhibit A. For the sake of consistency and clarity, we refer to the cover sheet attached to both exhibits A and B as the fax cover sheet.

California clinic that collected and forwarded the vaginal swab, the rectal swab, and the urine sample to the California laboratory that performed the tests. Murphy further testified that she raised "a concern of sexual abuse" with the California clinic. According to Murphy, "confirming a chlamydia test result was an important thing to do . . . especially when there's a question raised of acquiring the germ from sexual abuse." Murphy further testified that she handwrote the fax cover sheet before she forwarded the California laboratory results to Stankye.

Stankye testified at the habeas trial that, at the time of the petitioner's arrest, he worked as a youth officer investigating sexual assault and youth crimes and that he participated in the criminal investigation of the petitioner. Stankye testified that he knew Murphy through the multidisciplinary team and that they had previously worked together on the team. Stankye further testified that he learned of the California laboratory test results from Murphy when she faxed them to him. Stankye also testified that, once he received the California laboratory test results, he handwrote the police case file number on the upper right-hand corner of the fax cover sheet.

Gulash testified that he represented the petitioner in his underlying criminal trial. He further testified that he had raised the confrontation clause issue in the petitioner's criminal trial and "definitely was aware of the test results from California" but was not sure about his knowledge of the fax cover sheet. Gulash testified that he had a digitized copy of his prior file but that he had not reviewed it to see if it contained the fax cover sheet. Gulash testified that he specifically remembered having a copy of the California laboratory test results but could not say one way or the other whether he had ever received the fax cover sheet. Gulash testified that his objection to the admission of the California laboratory test results was based on "evidentiary predicates,"

not on whether Murphy acted in a semi-law enforcement capacity. Gulash further testified that he did not do any more to prove that the California medical professionals were acting for a law enforcement purpose because "[i]t was not an issue" from his perspective.

After Gulash testified, the court agreed to keep the evidence open at the request of the petitioner to provide Gulash with an opportunity to check his files to determine whether he was ever in possession of the fax cover sheet. The parties later filed a joint notice with the court stating that they could not reach Gulash to confirm that he had the fax cover sheet in his file.

Prior to the close of evidence, the court raised the "issue of why the allegation that the petitioner's right to confrontation in count three should not be dismissed on grounds of res judicata pursuant to Practice Book § 23-29 because the Appellate Court had already addressed the same claim." After closing arguments, both parties submitted posttrial briefs.

In his posttrial brief, the petitioner argued that the court should not dismiss count three of his petition on the ground of res judicata. He argued that, "[w]hile the petitioner cannot assert that there was a landmark change in the law related to confrontation clause claims after the petitioner's criminal trial, there were at least two cases from the United States Supreme Court after the petitioner's criminal trial, but during the pendency of the petitioner's appeal, that clarified the law on confrontation clause claims in light of *Crawford*." Specifically, the petitioner argued in his posttrial brief that the United States Supreme Court's decisions in *Bullcoming* v. *New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), and *Williams* v. *Illinois*, 567 U.S. 50, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012), clarified the law on the issue of the admission of laboratory reports in criminal proceedings and, therefore, trial counsel and

the trial court would have been in a completely different position regarding the significant questions to present and resolve on the record related to the admission of the California laboratory test results.

On November 8, 2023, the court issued a memorandum of decision dismissing count three of the operative petition on the ground of res judicata and denying the petition as to the remaining counts. In its memorandum of decision, the court noted that the petitioner "claimed that count three [was] not subject to procedural default because he now has 'newly discovered evidence' and was not previously afforded the opportunity to have a full and fair hearing on the claim that his right to confrontation was violated." The court noted that the petitioner asserted that "Murphy's testimony at the criminal trial that she had received the results from the California tests via telephone and had reviewed them shortly before her testimony on February 11, 2010, was false or materially misleading" and that "a fax cover sheet showing that a copy of those results was faxed over to [Stankye]" proved that "Murphy was acting as 'a direct arm of law enforcement' instead of just as a medical professional." The court noted that "[t]he *inference* created by the fax cover sheet that [Murphy] was acting 'as a direct arm of law enforcement' was further evidence, according to the petitioner's . . . theory, that [Murphy] likely discussed the law enforcement purposes of the tests with the California lab technicians." (Emphasis in original.)

The court found, however, that, first, "the petitioner has not submitted the slightest shred of credible evidence to establish exactly who—the California lab or the referring California physician—communicated the test results to [Murphy] or that [Murphy] actually had contact of any kind with anyone at the California lab. Second, [Gulash] was unable to say definitively that he did *not* receive a copy of the fax cover sheet when he was

provided a copy of the California test results. Therefore . . . assum[ing] the fax cover sheet was a material piece of evidence, there is no credible evidence upon which to find that it was not turned over to [Gulash]." (Emphasis in original.) The court concluded that the petitioner "failed to present any new evidence that could not have been discovered previously, and raising the same legal claim he previously raised and litigated in his direct appeal, the petitioner is barred from litigating the same claim again here by the doctrine of res judicata."

Thereafter, the petitioner filed a timely petition for certification to appeal, which the court denied. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

On appeal, the petitioner first claims that the court abused its discretion in denying his petition for certification to appeal. We are not persuaded.

"Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [a] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and applicable legal principles. . . . If the petitioner succeeds in surmounting that hurdle, the petitioner must then demonstrate that the judgment of the habeas court should be reversed on its merits." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Crespo* v. *Commissioner of Correction*, 292 Conn. 804, 811, 975 A.2d 42 (2009); see also *Simms* v. *Warden*, 230 Conn. 608, 615–16, 646 A.2d 126 (1994) (adopting factors identified by United

States Supreme Court in *Lozada* v. *Deeds*, 498 U.S. 430, 431–32, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991), as appropriate standard for determining whether habeas court abused its discretion in denying certification to appeal).

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by [our Supreme Court] for determining the propriety of the habeas court's denial of the petition for certification." (Internal quotation marks omitted.) *Villafane* v. *Commissioner of Correction*, 190 Conn. App. 566, 573, 211 A.3d 72, cert. denied, 333 Conn. 902, 215 A.3d 160 (2019). For the reasons set forth in this opinion, we conclude that the petitioner has failed to demonstrate that his underlying claims of error are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the question raised is adequate to deserve encouragement to proceed further.

II

The petitioner next claims that the court improperly dismissed count three of his operative petition alleging a violation of his constitutional right to confrontation on the ground of res judicata. Specifically, the petitioner asserts that he presented newly discovered evidence at the habeas trial demonstrating that the California laboratory test results were testimonial hearsay. The respondent counters that the court correctly determined that res judicata barred the petitioner's confrontation claim because the petitioner did not present new facts

or proffer new evidence to support his claim. We agree with the respondent.

Before we turn to the petitioner's claim, we briefly set forth the appropriate standard of review for a dismissal of a habeas petition. "The conclusions reached by the [habeas] court in its decision to dismiss [a] habeas petition are matters of law, subject to plenary review. . . . [When] the legal conclusions of the court are challenged, [the reviewing court] must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record. . . . To the extent that factual findings are challenged, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous . . . ." (Citations omitted; internal quotation marks omitted.) *Carter* v. *Commissioner of Correction*, 203 Conn. App. 794, 803, 249 A.3d 749, cert. denied, 336 Conn. 952, 251 A.3d 992 (2021).

"The doctrine of res judicata provides that a former judgment serves as an absolute bar to a subsequent action involving any claims relating to such cause of action [that] were actually made or which might have been made. . . . The doctrine . . . applies to criminal as well as civil proceedings and to state habeas corpus proceedings. . . . However, [u]nique policy considerations must be taken into account in applying the doctrine of res judicata to a constitutional claim raised by a habeas petitioner . . . . Specifically, in the habeas context, in the interest of ensuring that no one is deprived of liberty in violation of his or her constitutional rights . . . the application of the doctrine of res judicata . . . [is limited] to claims that actually have been raised and litigated in an earlier proceeding. . . .

"In the context of a habeas action, a court must determine whether a petitioner actually has raised a new legal ground for relief or only has alleged different factual

allegations in support of a previously litigated claim . . . . Identical grounds may be proven by different factual allegations, supported by different legal arguments or articulated in different language. . . . They raise, however, the same generic legal basis for the same relief. Put differently, two grounds are not identical if they seek different relief. . . .

"[T]he doctrine of res judicata in the habeas context must be read in conjunction with Practice Book § 23-29 (3), which narrows its application. . . . [Section] 23-29 states in relevant part: The judicial authority may, at any time, upon its own motion or upon motion of the respondent, dismiss the petition, or any count thereof, if it determines that . . . (3) the petition presents the same ground as a prior petition previously denied and fails to state new facts or to proffer new evidence not reasonably available at the time of the prior petition. . . . Thus, a . . . petition alleging the same ground [previously litigated] will elude dismissal if it alleges grounds not actually litigated in [an earlier proceeding] and if it alleges new facts or proffers new evidence not reasonably available at the time of the earlier [proceeding]. . . . In this context, a ground has been defined as sufficient legal basis for granting the relief sought. Simply put, an applicant must show that his application does, indeed, involve a different legal ground, not merely a verbal reformulation of the same ground. . . . Further, this doctrine applies equally to claims litigated on direct appeal, not just to claims raised in prior habeas petitions. . . ." (Citations omitted; internal quotation marks omitted.) *Sanchez* v. *Commissioner of Correction*, 203 Conn. App. 752, 762–64, 250 A.3d 731, cert. denied, 336 Conn. 946, 251 A.3d 77 (2021); see also *Faraday* v. *Commissioner of Correction*, 107 Conn. App. 769, 776–77, 946 A.2d 891 (2008) ("[t]his claim, having been resolved in the petitioner's direct appeal, is barred by the doctrine of res judicata and is not subject to collateral attack");

*Fernandez* v. *Commissioner of Correction*, 86 Conn. App. 42, 45–46, 859 A.2d 948 (2004) (applying res judicata to claims in habeas petition that previously had been resolved on direct appeal).

"It is incumbent on the petitioner to establish that evidence would not have been reasonably available at the time of a prior petition. . . . [Thus] when [a] petitioner [brings] a claim on the same legal ground and [seeks] the same relief, he can avoid dismissal only by *alleging* and *demonstrating* that evidence necessary to support the newly asserted facts was not reasonably available at the time of the prior petition . . . ." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Sanchez* v. *Commissioner of Correction*, supra, 203 Conn. App. 770.

In the present case, the petitioner concedes that he has sought habeas review of a claim that was unequivocally raised, litigated, and decided on direct appeal. The petitioner nevertheless argues that "[s]ubsequent developments in Connecticut's decisional jurisprudence, the existence of the fax cover sheet from [Murphy] to [Stankye], and the testimony of both [Murphy] and [Stankye] at the habeas proceeding provide ample basis for consideration of this claim on the merits . . . ." The petitioner argues that the fax cover sheet and the habeas trial testimony of Murphy and Stankye were not reasonably available because they were not previously a part of the record. The petitioner asserts that these facts demonstrate that the California laboratory test results were testimonial hearsay and, therefore, were admitted in violation of *Crawford*. The respondent counters that proving that a claim is not barred by res judicata requires "new facts or . . . new evidence," that the petitioner "has not established that the fax cover sheet was not reasonably available to Gulash at the time of his criminal trial," and that the petitioner "has not established that he could

not have elicited [Murphy's habeas testimony] during his cross-examination of Murphy at his criminal trial." The respondent also contends that Murphy "provided essentially the same testimony at the petitioner's criminal and habeas trial[s]," and that the fax cover sheet was not material to the petitioner's confrontation clause claim.

## A

We first address the petitioner's argument that "[s]ubsequent developments in Connecticut's decisional jurisprudence . . . provide ample basis for consideration of this claim on the merits . . . ." The respondent counters that subsequent developments in *Crawford* jurisprudence do not help the petitioner to prove that his claim is not barred by the doctrine of res judicata because, in order to do so, he must present new facts or proffer new evidence not reasonably available to him at the time of his criminal trial. For the reasons that follow, we reject the petitioner's first argument.

We begin our analysis by noting that, in his posttrial brief, the petitioner acknowledged that he could not "assert that there was a landmark change in the law related to confrontation clause claims after [his] criminal trial . . . ." As previously mentioned in this opinion, he asserted in his posttrial brief that the United States Supreme Court's decisions in *Bullcoming* and *Williams* "significantly" clarified the law regarding the admission of laboratory reports, and therefore, his claim was not barred by res judicata. In his principal appellate brief before this court, the petitioner argues for the first time that the "evolution of Connecticut's jurisprudence in the decade since [the petitioner's] direct appeal, coupled with . . . Murphy's testimony at [the petitioner's] habeas proceeding, establish[ed] that the laboratory technician reasonably could have known that the results were intended for use in a criminal prosecution." According to the petitioner, our Supreme Court's decisions in *State*

v. *Walker*, 332 Conn. 678, 212 A.3d 1244 (2019), and *State* v. *Sinclair*, 332 Conn. 204, 210 A.3d 509 (2019), and the United States Supreme Court's decision in *Ohio* v. *Clark*, 576 U.S. 237, 135 S. Ct. 2173, 192 L. Ed. 2d 306 (2015), support his claim that the California laboratory test results were testimonial hearsay.

Our Supreme Court in *Walker* undertook an extensive review of the trilogy of United States Supreme Court cases applying the primary purpose test to distinguish testimonial from nontestimonial statements. It noted that, in "*Melendez-Diaz* [v. *Massachusetts*, 557 U.S. 305, 308, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009)], during the defendant's trial on narcotics violations, the prosecution introduced into evidence three laboratory certificates of analysis stating that the substance seized from the defendant was cocaine. . . . The United States Supreme Court held that the certificates were within the core class of testimonial statements because they were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. . . . The court explained that the analysts' reports were quite plainly affidavits, that is, declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths, and were functionally identical to live, in-court testimony. . . . The court also noted that, under Massachusetts law, the sole purpose of the affidavits was to establish the composition, quality and weight of the substance believed to be cocaine and that it could be safely assume[d] that the analysts were aware of the affidavits' evidentiary purpose, since that purpose . . . was reprinted on the affidavits themselves. . . .

"In *Bullcoming* v. *New Mexico*, supra, 564 U.S. 663, the court held that the admission at trial of a lab report certifying that the defendant's blood alcohol content exceeded the threshold for the offense of aggravated

driving while intoxicated violated the confrontation clause. Emphasizing that [a] document created solely for an evidentiary purpose . . . made in aid of a police investigation, ranks as testimonial, the court concluded that the report, although not sworn or notarized, closely resembled the reports at issue in *Melendez-Diaz*. . . . That is, law enforcement had provided seized evidence to a state laboratory for testing, an analyst tested the evidence and prepared a certificate concerning the results, and the certificate was formalized in a signed document entitled report, which contained a reference to local rules concerning the admission of certified blood alcohol test results. . . . These circumstances, the court concluded, were more than adequate to qualify the analyst's report as testimonial. . . . Furthermore, the court held that the testimony of a surrogate witness, who was familiar with the device used in the test and the laboratory's testing procedures but who did not conduct or observe this particular test, was insufficient to satisfy the confrontation clause. . . .

"Finally, in *Williams* v. *Illinois*, supra, 567 U.S. 59, an outside laboratory provided the police with a DNA profile generated from semen found on a vaginal swab of the victim of a rape. The police entered the profile into its DNA database and received notification of a cold hit with the defendant's DNA profile, which had been entered into the database due to an unrelated arrest. . . . The defendant was arrested and charged with the victim's rape. . . . At trial, the prosecution called the analyst who prepared the defendant's DNA profile in connection with the unrelated arrest, as well as the analyst who compared that profile to the DNA generated by the outside laboratory from the victim's vaginal swab. . . . No one from the

outside laboratory who generated the profile from the vaginal swab, however, testified at trial. . . .

"Five justices agreed that the profile from the vaginal swabs relied upon by the analyst to make her comparison was not testimonial but the fifth justice rejected the plurality's flawed analysis . . . as did the four dissenting justices. . . . The plurality opinion, written by Justice Alito, concluded that the evidence was not testimonial because the primary purpose of the [outside laboratory's] report, viewed objectively, was not to accuse [the defendant] or to create evidence for use at trial. When the [police] sent the sample to [the outside laboratory], its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against [the defendant], who was neither in custody nor under suspicion at that time. . . . The plurality reasoned that, because no one from the outside laboratory could have known the profile would inculpate the defendant—or anyone else whose DNA profile was in the police database—there was no prospect of fabrication and no incentive to produce anything other than a scientifically sound and reliable profile. . . .

"Justice Thomas authored a separate opinion concurring in the judgment reiterating his view that the confrontation clause covers only formalized testimonial materials, such as depositions, affidavits, and prior testimony, or statements resulting from formalized dialogue, such as custodial interrogation. . . . He reasoned that the primary purpose test, as articulated in *Davis*, was a necessary but insufficient criterion to render a statement testimonial because statements often serve more than one purpose. . . . He concluded that the report at issue was not sufficiently formal to be testimonial because it was not sworn or certified. . . . Justice Thomas and the four dissenting justices, however, rejected the plurality's view that a statement must have the primary purpose

of accusing a targeted individual of criminal conduct in order to be testimonial. . . .

"Justice Kagan, writing for the four dissenting justices, concluded that the court's prior decisions in *Melendez-Diaz* and *Bullcoming* compelled the conclusion that the DNA profile in the outside laboratory's report was testimonial because it was a statement [that] was made for the primary purpose of establishing past events potentially relevant to later criminal prosecution—in other words, for the purpose of providing evidence. . . . The dissenting justices rejected Justice Thomas' view that the statements were not testimonial because they were not sworn or certified, arguing that, similar to the reports deemed testimonial in the court's prior cases, the report was an official and signed record of laboratory test results, meant to establish a certain set of facts in legal proceedings.

"Due to the fractured nature of the *Williams* decision, courts have struggled to determine the effect of *Williams*, if any, on the legal principles governing confrontation clause claims. . . . As we recently observed, the court in *Williams* made it impossible to identify the narrowest ground because the analyses of the various opinions are irreconcilable. *State* v. *Sinclair*, [supra, 332 Conn. 225]. Consequently, we explained in *Sinclair* that we must rely on [United States] Supreme Court precedent before *Williams* to the effect that a statement triggers the protections of the [c]onfrontation [c]lause when it is made with the primary purpose of creating a record for use at a later criminal trial." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Walker*, supra, 332 Conn. 702–706.

Our Supreme Court in *Walker* concluded that, given the lack of any definitive holding in *Williams*, *Melendez-Diaz* remains controlling precedent. Id., 713–14. In the present case, this court in *State* v. *Anwar S.*, supra, 141

Conn. App. 355, considered the testimonial nature of the California laboratory test results under the guiding principles set forth in *Melendez-Diaz* and *Bullcoming*. It concluded that "the laboratory report in the present case lacks the indicia of formality that were present in both *Melendez-Diaz* and *Bullcoming*, and, thus, was not a testimonial statement. In this case, the report provided information including the patient's name, the specimen sources, the result of the analyses, the dates and time the specimens were collected and received, and the date and time the results were reported. The report, however, did not provide information regarding admissibility of laboratory results, it was not notarized and it did not bear any form of certification as to the accuracy of the analyst's statements or the procedures used. Moreover, the report was devoid of any accusatory information such as the [petitioner's] identity or details regarding T's contraction of the infection. These circumstances, viewed objectively, would not have led the analyst reasonably to believe that his or her statements in the laboratory report would later be used at trial." Id., 365–66. This court concluded that the analyst's statements were not testimonial in nature and, thus, the confrontation clause was not implicated. Id., 366. Because the legal principles this court applied on direct appeal are identical to the principles in effect today, the petitioner's first argument fails.

B

We now turn to the petitioner's argument that the discovery of the fax cover sheet is newly discovered evidence that precludes dismissal of his petition on the ground of res judicata. The respondent counters that the "petitioner has not established that the fax cover sheet was not reasonably available to him at the time of the criminal trial." We agree with the respondent.

In the present case, the petitioner alleges in his operative petition that the "defense was not privy to documentation of Murphy's correspondence with law enforcement about the laboratory test results referencing the relevant police case number, which undermined the petitioner's ability to make an adequate record about Murphy's law enforcement function in the case." In his principal appellate brief, the petitioner argues that, "assuming arguendo, but not at all conceding, that [this court] was correct in its analysis on direct appeal, had the fax cover sheet been part of the record, counsel could have raised such an argument on appeal and prevailed. Absent such evidence, appellate counsel could not have pursued such a claim as it would not have properly been before the Appellate Court."

As previously mentioned in this opinion, when a petitioner brings a claim on the same legal ground and seeks the same relief previously adjudicated, he can avoid a dismissal on res judicata grounds only by alleging and demonstrating that evidence necessary to support the newly asserted facts was not reasonably available at the time of trial. See *Sanchez* v. *Commissioner of Correction*, supra, 203 Conn. App. 770. In the present case, the petitioner has not demonstrated that the fax cover sheet was not reasonably available to him at the criminal trial. At the habeas trial, Gulash testified that he could not recall if he ever had the fax cover sheet in his file. Counsel for the petitioner asked the court to keep the evidence open so that Gulash could check his file to see if he in fact had the fax cover sheet. Gulash, however, never responded to petitioner's counsel. Thereafter, counsel filed a joint notice with the court indicating that they could not confirm whether Gulash was in possession of the fax cover sheet. In its memorandum of decision, the court specifically found that "Gulash was unable to say definitively that he did *not* receive a copy of the fax cover sheet when he was provided a copy of the California

test results." (Emphasis in original.) The court further found that there "is no credible evidence upon which to find that it was not turned over to [Gulash]." On appeal, the petitioner does not challenge the court's finding. On the basis of that finding, the court properly concluded that, "[h]aving failed to present any new evidence that could not have been discovered previously, and raising the same legal claim he previously raised and litigated in his direct appeal, the petitioner is barred from litigating the same claim again here by the doctrine of res judicata." (Emphasis omitted.) Accordingly, we conclude that the petitioner has failed to demonstrate that the fax cover sheet was not reasonably available to him at the time of the criminal trial.

C

Lastly, the petitioner asserts that "there can be no serious dispute that [Murphy] relayed the clinic test results to [Stankye] for any purpose other than prosecutorial." In support of this argument, the petitioner asserts that, "although [Murphy] testified [at the criminal trial] that the purpose of the California test was to confirm the diagnosis, which would not have been done without the specter of sexual abuse, her testimony was devoid of the standardized policy requirements explicated at the habeas trial." Moreover, he argues that Murphy's and Stankye's testimony at the habeas trial confirmed that Stankye was notified of the California laboratory test results via fax from Murphy. The petitioner further asserts that, under *State* v. *Sinclair*, supra, 332 Conn. 228, citing *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 322–23, "[i]f a nontestimonial record is used to create a new record for the purpose of providing evidence for a criminal prosecution, that new record is testimonial." According to the petitioner, Murphy created a new record for the explicit purpose of providing evidence for the prosecution of the petitioner by attaching the fax cover

sheet to the California laboratory test results when she faxed it to Stankye. We are not persuaded.

Murphy's testimony at the criminal trial was substantially the same as her testimony at the habeas trial. At the criminal trial, Murphy testified that, because "we were concerned that the chlamydia was acquired from sexual abuse, we needed to confirm that this was the actual diagnosis." At the habeas trial, Murphy again emphasized the importance of confirming a chlamydia test "especially for someone under thirteen" and "when there's a question raised of acquiring the germ from sexual abuse." In both trials, Murphy's testimony expressed the importance of confirming a diagnosis of chlamydia to confirm whether the germ was acquired from sexual abuse, especially in cases in which the victim is under thirteen years old.

Neither the fax cover sheet from Murphy to Stankye, nor Murphy's and Stankye's testimony at the habeas trial that Stankye received the laboratory test results from Murphy make the laboratory test results testimonial in nature. As previously stated in *State* v. *Anwar S.*, supra, 141 Conn. App. 362, whether the laboratory test results were testimonial in nature "turns on the reasonable expectation of the laboratory analysts, who prepared the report, under the circumstances in this case." In the present case, this court concluded that, "[a]lthough the state concedes that the California reports serve a dual medical-prosecutorial purpose, [the petitioner] has not pointed us to any evidence in the record that the *laboratory analysts understood the request as such*. Murphy testified that T's laboratory results were reported to her verbally by T's physician and not the laboratory analysts. These circumstances lessen the likelihood that the analysts were aware of either Murphy's or Connecticut law enforcement's involvement." (Emphasis added.) Id., 367. At the habeas trial, Murphy testified

that she told Stankye about the California laboratory test results and faxed them to Stankye. The fax cover sheet that she created when she faxed the laboratory results to Stankye does not provide any new information as to whether the California laboratory analysts knew that the test results would be utilized for prosecutorial purposes. As the habeas court found, the petitioner did not submit any "credible evidence to establish exactly who . . . communicated the test results to [Murphy] or that [Murphy] actually had contact of any kind with anyone at the California lab." Accordingly, we reject the petitioner's argument that Murphy created a "new record for the explicit purpose of providing evidence for the prosecution of [the petitioner]."

Because the petitioner has asserted a claim that previously was adjudicated fully on the merits and has failed to state new facts or to proffer new evidence that was not reasonably available to him when he filed his direct appeal, we agree with the respondent that the petitioner's confrontation clause claim is barred by the doctrine of res judicata. We conclude, therefore, that the court properly dismissed the petitioner's claim.

The appeal is dismissed.

In this opinion the other judges concurred.